**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

| | |
|---|---|
| **DAREL ADELSBERGER<br>AND ANNETTE ADELSBERGER** | **PLAINTIFFS** |
| V.    Case No. 4:21-cv-00471 | |
| **UNION PACIFIC RAILROAD COMPANY** | **DEFENDANT** |

**UNION PACIFIC RAILROAD COMPANY'S BRIEF
IN SUPPORT OF ITS MOTIONS IN LIMINE**

For the reasons outlined below, Plaintiffs Darel and Annette Adelsberger should be prohibited from introducing evidence, and their counsel should be prohibited from arguing or implying in questions to witnesses, matters related to the following:

**1.    Testimony, Photographs, and Evidence of Specific Instances of Flooding Prior to December 3, 2015.**

The Court recently granted Union Pacific's motion for partial summary judgment and held that Plaintiffs are precluded from seeking damages more than three years before they filed their complaint (i.e., before December 3, 2015). Given the Court's holding, Plaintiffs should also be precluded from offering testimony and using evidence, such as photographs, related to specific instances of flooding before December 3, 2015. In light of the Court's partial summary judgment order, any such testimony and evidence are now irrelevant. Fed. R. Evid. 401-402.  Moreover, allowing Plaintiffs to show the jury photos of the culvert being blocked or flooding to the Adelsberger's property before December 3, 2015 would confuse the issues, mislead the jury, and constitute a waste of time. More importantly, any probative value the evidence or testimony might have would be substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 401-403.

1

Because Plaintiffs cannot recover for flooding caused by the culvert being blocked before December 3, 2015, this evidence should not be admitted. Union Pacific's motion should be granted.

2. **Damages Computations that Were Not Timely Produced.**

On the evening of June 13, 2022 – the court-ordered discovery deadline – Plaintiffs emailed a "supplemental document disclosure." *See* Exhibit 1, June 13, 2022 email. The supplemental disclosure included hundreds of pages of documents that purportedly comprise Plaintiffs' damages computation. *See* Exhibit 2. Curiously, in the lower right-hand corner of each page (except for the summary), it states, "Printed on: 7/19/2016." In any event, these documents came with no explanation, no description, and worse – no time to conduct discovery because Plaintiffs waited until after 6:00 PM on the day of the discovery cutoff to produce them. *See* Exhibit 1. The Court's Final Scheduling Order provides that "[w]itnesses and exhibits not identified in response to appropriate discovery may not be used at trial except in extraordinary circumstances." *See* Ct. Doc. 9. Plaintiffs' failure to comply with this directive and make timely disclosures has prejudiced Union Pacific. Accordingly, the documents should be excluded.

The purpose of discovery "is to narrow the issues, to eliminate surprise, and to achieve substantial justice." *Greyhound Lines, Inc. v. Miller*, 402 F.2d 134, 143 (8th Cir. 1968). As such, Federal Rule of Civil Procedure 26(a)(1)(A)(iii) provides that parties must make initial disclosures, including a computation of all types of damages, and must supplement their initial disclosures when they learn of new information. If a party fails to timely disclose the required information, the Court "has wide discretion to fashion a remedy or sanction as appropriate for the particular circumstances of the case." *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008). The Court

"may exclude the information or testimony as a self-executing sanction unless the party's failure to comply is substantially justified or harmless." Fed. R. Civ. P. 37(c)(1); *Wegener*, 527 F.3d at 692.

Here, Plaintiffs' failure to comply with their discovery obligation is neither harmless nor substantially justified. In addition to the initial disclosure requirements, Union Pacific specifically requested that Plaintiffs produce all evidence supporting their claimed damages in its first set of discovery and in notices of depositions to Plaintiffs. Exhibit 3, Def. First RFP to Pls. at pg. 8; Exhibit 4, Dep. Notices. Plaintiffs served their discovery responses on March 3, 2022 and were deposed, but they never produced the documents in question until it was too late – especially given that they were "Printed on: 7/19/2016." Accordingly, the documents should be excluded.

### 3. Witnesses and Materials Not Timely Disclosed.

Similar to the preceding motion, Plaintiffs should be prohibited from calling any witness not timely disclosed in accordance with the Court's Final Scheduling Order. Specifically, Plaintiffs' pretrial disclosures include the names of several people that they never disclosed in response to Union Pacific's interrogatory number two, which asked Plaintiffs to "[i]dentify every person who is expected to be called to testify at trial…". *See* Exhibit 3, pages 1-2. Union Pacific does not know the purpose for these witnesses or the subject of their desired testimony, and it has no time to discover either before trial. For the reasons stated in motion no. 2 above, these witnesses should be excluded.

Likewise, Plaintiffs have continued to make belated supplements to their discovery responses, including a supplement on August 22, 2022 – more than two months after the close of discovery. Exhibit 5. That supplement included, among other things, Plaintiffs' tax returns from 2019 and 2020. In its request for production of documents served on January 10, 2022, Union

Pacific asked Plaintiffs to "[p]roduce all of Plaintiffs' personal and business tax returns for Plaintiffs from the date you purchased the property until the present date, including all supporting documentation submitted to the IRS or to your accountant." In their response to this discovery request, dated May 14, 2022, Plaintiffs produced tax returns from 2011-2018 but no tax returns from 2019 or 2020. Those two returns were only produced two - and - a - half weeks ago. The Court should not allow Plaintiffs to introduce or use anything untimely disclosed, including the 2019 and 2020 tax returns and the other documents produced on August 22, 2022, as it prejudices Union Pacific.

### 4. That Union Pacific Violated an Internal Policy or Rule.

Plaintiffs should not be allowed to argue that Union Pacific violated an internal railroad rule or use documents, such as UP-Adelsberger-000001-000010, to support such an argument. Arkansas substantive law holds that internal guidelines and policies cannot form the basis of tort liability and are inadmissible for that purpose. *See, e.g., Bedell v. Williams*, 2012 Ark. 75 (2012) (affirming the principle that an internal rule of a business does not impose a legal duty); *Young v. Gastro-Intestinal Ctr., Inc.*, 361 Ark. 209, 215-216, 205 S.W.3d 741, 746 (2005) (holding that the internal policies of an endoscopy center did not impose a legal duty to control a sedated patient to prevent him from driving home); *Kroger Co. v. Smith*, 93 Ark. App. 270, 275, 218 S.W.3d 359, 363 (2005) (holding that the defendant's internal policy for its clerks to assist customers did not create a legal duty to assist the plaintiff in taking her groceries to the car); *Arkansas & Louisiana Gas Co. v. Stracener*, 239 Ark. 1001, 395 S.W. 2d 745 (1965) (stating that a gas company rule that required its employees to tag a gas meter after turning off the gas did not establish a standard of care and should not have been included in a jury instruction); *see also Weisker v. Harvest Mgt.*

*Sub LLC*, 2016 Ark App. 220, at 3, 489 S.W.3d 696, 698 (stating that a company's internal policies "do not translate into a duty at law"). Accordingly, Plaintiffs should be prohibited from arguing that Union Pacific violated an internal rule.

### 5. Emails from Attorney Stan Rauls to Brandon Morris.

In their pretrial disclosures, Plaintiffs have stated their intent to offer emails from their former attorney, Stan Rauls, to Brandon Morris, a former Union Pacific employee. Union Pacific objects to the introduction of these emails because they refer to events before December 3, 2015, and the Court has already dismissed Plaintiffs' claims for damages arising prior to that day. Accordingly, the emails are irrelevant and would confuse the issues, be misleading to the jury, and constitute a waste of time. Fed. R. Evid. 401-403.

Furthermore, the emails are double hearsay and contain arguments from Plaintiffs' former counsel, Mr. Rauls. Fed. R. Evid. 801-802, 805. Plaintiffs cannot create evidence through their own lawyer's communications. These emails should be excluded.

### 6. Testimony about a Second Site Inspection.

The Court should prohibit Plaintiffs, their witnesses, and their counsel from testifying or referencing a request for a second site inspection for Dr. Overton and Union Pacific's purported refusal. Plaintiffs did not request a second inspection until after the expert disclosure deadline – meaning that changes would have to be made to the Court's Scheduling Order and the trial likely delayed. Moreover, Plaintiffs were free to file a motion and request a site inspection, but they chose not to do so. As such, they should not be permitted to bring up the belated request at trial. The

danger of unfair prejudice to Union Pacific by such testimony substantially outweighs any probative value. Fed. R. Evid. 401-403. Accordingly, Union Pacific's motion should be granted.

7. **<u>Testimony about Lost Profits.</u>**

The Court should prohibit Plaintiffs, their witnesses, and their counsel from testifying or arguing that the Plaintiffs are entitled to lost profits. To recover lost profits, an established business must prove with "reasonable certainty" that the profits would have been realized. *Black v. Hogsett*, 145 Ark. 178, 182, 224 S.W. 439, 440 (1920). Only the net loss is recoverable. *Interstate Oil Supply Co. v. Troutman Oil Co.*, 334 Ark. 1, 972 S.W.2d 941 (1998); *Ishie v. Kelley*, 302 Ark. 112, 114, 788 S.W.2d 225, 226 (1990). And, the net loss must be shown with reasonable certainty. *Ishie v. Kelley*, 302 Ark. 112, 114, 788 S.W.2d 225, 226 (1990). "Reasonable certainty" means that "a plaintiff must present a reasonably complete set of figures and not leave the jury to speculate." *Id*. "Proof of damages has been found to be speculative when proof is based upon too many variables to make an accurate projection, or they are based upon conjectural evidence or they are opinions of the parties or witnesses." *Minyard v. Habbe*, 2001 Ark. App. LEXIS 638, *10 (Sept. 19, 2001) (*citing to Interstate Oil Supply Co. v. Troutman Oil Co.*, 334 Ark. 1, 972 S.W.2d 941 (1998) and *Orsini v. Larry Moyer Trucking, Inc.,* 310 Ark. 179, 833 S.W.2d 366 (1992)). The jury cannot be left to engage in speculation and conjecture about Plaintiffs' alleged damages. *Pennington v. Harvest Foods, Inc.*, 326 Ark. 704, 934 S.W.2d 485 (1996).

In this case, the only witnesses disclosed by the Plaintiffs who could testify about lost profits are Darel and Annette Adelsberger. But Darel Adelsberger repeatedly disavowed such knowledge during his deposition:

> Q. Do you know why in 2016 the net profit of the business went from over $30,000 down to just over $23,000 [in 2017]?
>
> A. To answer your question, to give you a positive -- no, I can't give you a positive. It can be a course of events. …We used to send a whole half a car to California for

6

>   $100, and now it'll cost us $700. …I mean, there's – there's a lot of things that go into this. …Supply and demand. So it changes. It's going to change. We -- our income is up and down like a yo-yo.

See Exhibit 6, p. 62-63.

>   Q.   How does the stock market affect your business?
>
>   A.   Your -- when the stock market is up, people are buying more new cars than they are used cars. When it's down they buy -- they patch up what they got.
>
>   Q.   And that increases your business?
>
>   A.   Well, it depends. If they've got an old car, I don't get -- it's not $150 alternator, it's a $25 alternator. It's all relevant [sic].
>
>   Q.   What's better for your business, a stock market that's high or one that's low or one that's in between?
>
>   A.   One that's low.

See Exhibit 6, p. 65.

>   Q.   But AA Auto Salvage doesn't sell cars that people just drive off, do you?
>
>   A.   Yeah.
>
>   Q.   How many?
>
>   A.   I don't know. Maybe sometimes 20 in a year and sometimes 10, sometimes five. I mean, when they start this nothing down, and people that have no credit at all can go down and buy a car at Fletcher, he has nine ways to finance a car. They can sleep on the freeway and not have a job and still buy a new car. All right. Well, they won't be out at my place, because first of all, they're going to have to pay cash for it.
>
>   Q.   Right. That hurts your business?
>
>   A.   Well, it slows it down.

See Exhibit 6, p. 66-67.

>   Q.   What else could affect AA Auto Salvage and businesses like yours from one year to the next?
>
>   A.   Employees.
>
>   Q.   How so?

7

You can't hardly get anybody to work anymore.

See Exhibit 6, p. 69.

    Q.    Do you know what caused the drop between 2017 and 2018 going from $23,740 to $16,913?

    A.    Well, I guess since that's all they talk about. They're talking about Trump and his lying. You know, I don't know. Trump.

    Q.    Do you think that's what caused the difference?

    A.    I don't know. That's all you get on TV anymore, so just blame it on him.

See Exhibit 6, p. 70.

    Q.    If you were to tell me from 2016, 2017 and 2018, if you believe that you lost money because of the flooding on AA Auto property that was caused by the culvert being clogged up, how would you go about calculating how much the damages would be?

    A.    Well, I don't handle the books.

    Q.    Would that be more Ms. --

    A.    That would be Annette's deal. I wouldn't have any idea if they have 10,000 accounts receivable or 100,000. Okay. Now, I know I have one of the most desirable salvage yard locations that I know of, and I've been in this business and I'm 70. And I know the decrease in my property and my lack of income. It's just down to about the point that it's just not worth working anymore. Okay. Nothing to leave my son.

    Q.    But if I were going to ask for a number each year, I'd need to get that from Annette?

    A.    Yeah, you would. You started asking me why and how come. There's so many factors -- I'm neither a public accountant or a lawyer, so I -- I'm just working man.

    Q.    I understand. You wouldn't be able to provide me that information?

    A.    No.

See Exhibit 6, p. 79-80.

Like her husband, the testimony of Annette Adelsberger makes clear that the jury would be left to speculate or conjecture about lost profits because she admitted that she cannot say why the net profits changed over the years. Ms. Adelsberger noted that there used to be a lot of small salvage businesses like theirs but that have gone by the wayside because some really big salvage

businesses have come onto the scene and taken a large share of the market. Exhibit 7, pages 87-88. She admitted that it is hard to pinpoint why the business fluctuates and how the market works. Exhibit 7, page 91. And, like her husband, Ms. Adelsberger did not know why the net profits of AA Auto varied (sometimes substantially) from one year to the next:

> Q. Well, let's just say from 2015 where you made less than $10,000 to 2016 where you made over $30,000?
>
> A. Yes, sir.
>
> Q. Why do you think the net profit tripled between those two years?
>
> A. I don't know. I don't know. It would only have to be in inventory. You know, the inventory, we were able to purchase some inventory, maybe we were actually able to crush one time. When you crush, then you -- you know, you get to boost your inventory up.
>
> Q. Well, do you think -
>
> A. But I don't know.
>
> Q. Do you think the standing water on the AA property was less in 2016 than 2015?
>
> A. I don't know that. I do not know that.
>
> Q. And [you] wouldn't have any record to prove it one way or the other?
>
> A. No, sir.
>
> Q. Then we see from 2016 where the net profit was a little over $30,000, [in] 2017 it's a little under $24,000. Do you know what the cause was for the net profit to go down roughly $7,000 between those two years?
>
> A. No, sir.
>
> Q. Same question with 2017 to 2018, would you know what caused that net profit to go down?
>
> A. No. Just sales in general and more outgo than income.

See Exhibit 7, p. 92-93.

There is no identified witness who can testify with reasonable certainty – as required under Arkansas law – to support a claim for lost profits. Plaintiffs cannot say why the net income has

9

changed from year to year, and they acknowledge it is because there are too many variables. Therefore, the Court should exclude any testimony about lost profits.

Plaintiffs have submitted a jury instruction regarding lost profits. In addition, last week, Plaintiffs sent Union Pacific a settlement proposal that was based upon a lost profit damage calculation. See Exhibit 8. This was the first time that Union Pacific was provided any lost profit calculation in this case and without any ability to determine how this calculation was created, who created it, or any basis for the numbers. There was no damage calculation ever provided in the Plaintiffs' initial disclosures, in response to discovery requests, in response to the duces tecum to the notice of Plaintiff's depositions, or in any of the depositions. Accordingly, Plaintiffs should be prohibited from having any witness testify about this alleged damage calculation. Further, this calculation is improper under Arkansas law, as will be explained in Union Pacific's Trial Brief.

Respectfully submitted,

Scott Tucker, #87176
Jamie Huffman Jones, #2003125
FRIDAY, ELDREDEGE & Clark, LLP
400 West Capitol Avenue, Suite 2000
Little Rock, AR 72201
501-370-1430 – phone
501-244-5347 – fax
jjones@fridayfirm.com
tucker@fridayfirm.com

*Attorneys for Union Pacific*